## HIRAM MARSHALL v. STATE.

No. A-4371.    Opinion Filed Nov. 17, 1923.
(219 Pac. 955.)

(Syllabus.)

Intoxicating Liquors—Evidence Insufficient to Sustain Conviction for Unlawful Sale. In a prosecution for selling intoxicating liquor, evidence reviewed, and held insufficient to support the verdict and judgment of conviction.

Appeal from County Court, Pawnee County; Chas. Verne, Judge.

Hiram Marshall was convicted of violation of the prohibitory liquor law, and he appeals. Reversed, and new trial granted.

McCollum & McCollum and T. S. Hurst, for plaintiff in error.

George F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

DOYLE, J. In the information in this case Hiram Marshall was charged with having sold one-half pint of whisky to one Ernest Wichita. Upon his trial the jury found him guilty and fixed his punishment at confinement in the county jail for 60 days and a fine of $200. His motion for a new trial was denied, and he appeals from the judgment rendered in pursuance of the verdict.

In order to present the question raised as to the sufficiency of the evidence, we will briefly state the same.

The state relied for this conviction upon the testimony of Ernest Wichita, who testified:

"I saw the defendant by Katz's corner or Roe's Grocery Store. I wanted to buy some whisky that day. I had an idea he had some. I asked him, and he said, 'Yes,' that he would

be back in a few minutes. I told him I would wait for him. It was not long until he came back with a half pint. I tasted it, to see if it was whisky, then put it in my pocket. I paid him $2 there on the street in front of Roe's Grocery Store. I was in the back end of Katz's store when he gave me the whisky. Somebody saw me, I guess, putting this whisky in my pocket, and just as soon as I got out of the store the city marshal came and got me."

His cross-examination was as follows:

"Q. What time of the day was it? A. Along in the evening.

"Q. Would you say it was as late as 2 o'clock? A. Right about 2, a little after.

"Q. How long had you known the defendant? A. I didn't know him.

"Q. Had you seen the defendant at any other place in Pawnee on that day? A. No, sir.

"Q. Were you down at Kelly's Feed Yard that morning? A. Yes, sir.

"Q. And one Blaine was with you? A. Yes, he was at the yard.

"Q. You boys were about to have a fuss? A. He claimed we were.

"Q. Now in this difficulty in the wagon yard, Tine Kelly finally told you to go? A. Yes.

"Q. Did you see the defendant there that morning? A. No, sir; I did not see him.

"Q. How long had it been since you had a drink? A. I had a drink that morning, extract.

"Q. You say you saw the defendant there in front of Roe's Grocery, and he said he would go and get this liquor? A. He said he would be back.

"Q. How long was he gone? A. About an hour.

"Q. Did you go back to Kelly's Yard after Blaine left? A. Yes, I went down there just to let him know I didn't come there for any trouble.

"Q. Did you see the defendant when you went back the second time? A. No, sir.

"Q. You had drank some extract that morning before you went to the yard? A. Yes.

"Q. Did you have enough to make you intoxicated? A. No, I knew what I was doing, all right."

C. H. Wilkerson, city marshal of Pawnee, testified:

"About 1 or 1:30 Constable Callahan told me that Wichita's father-in-law reported that Wichita had a gun on him and that he was afraid. I told Callahan that the first one that saw him would search him for this gun. In about two hours, or something like that, he came in a car, and Callahan remarked, 'There is Ernest now,' so we took him over to the jail and in searching him for the gun we found this bottle and turned him and the bottle over to sheriff."

As a witness in his own behalf the defendant testified:

"I buy and sell horses and keep my live stock at Kelly's Yard, and I work for Kelly. I saw Wichita, the complaining witness, at the yard that morning about 8 o'clock, talking to another Indian, Elmer Blaine. I thought they were going to fight. Mr. Kelly ordered them out of the yard. Shortly afterwards Wichita came back, and he and Mr. Kelly had some words, and Kelly ordered him out of the yard. Wichita started towards a neckyoke, but Mr. Kelly beat him to it and made him go out of the yard. At 9 o'clock I went over and dragged the race track until nearly noon, then came back with Mr. Hulse and went home to dinner, then went back to the yard. Doc Rule and I went uptown, and we met Mr. Wilkerson, city marshal, in front of the picture show, and I talked to him about the races. Then we returned to the yard. I didn't see Wichita on that trip. I did

not sell Wichita any whisky, I never did sell any whisky. I don't drink at all. I don't know that I ever tasted whisky; that Wichita seemed to be intoxicated when he was at the yard that morning. This was the first time I was ever arrested.''

Tine Kelly testified:

''I run a feed yard, and I am a member of the city council. I have known the defendant four or five years. I have known Wichita four or five years. He came to my yard that morning drunk, and called to Elmer Blaine to come over. They commenced talking angry, and I thought they were about to get into a fight, so I told them to go out on the street. They went out, and Wichita pulled off his coat. Shortly afterwards Wichita came back and jumped on me, saying that he could go any place he wanted to and I could not make him get out. I told him to get out, and he started for a neckyoke. I beat him to it and made him get out. The defendant was standing there at the time. I never did see the defendant have any whisky. About 2 o'clock the defendant and Doc Rule went uptown. I rode up horseback and saw them talking to City Marshal Wilkerson, then they came back to the barn.''

R. W. Rule testified:

''I am a veterinarian. I was at Kelly's barn that morning and heard Wichita and another Indian quarreling. Kelly ordered them out of the yard. A little later Wichita came back to the yard and raised a quarrel with Kelly and started to get a buggy neckyoke, and Kelly picked up the neckyoke and told Wichita to get out and stay out of the yard. The defendant was standing by Kelly when the trouble occurred. He passed me as he left the yard, and I heard him say, 'I will get both of you son-bitches before night.''

George Osborne testified:

''I was at the blacksmith shop across from Kelly's feed barn. About half past 1 or 2 o'clock the defendant called him over and wanted to trade horses. We talked trading for

about an hour and finally traded about 3 o'clock, when one of the city marshals came down and arrested the defendant."

One of the grounds of the motion for new trial assigned as error is that the court erred in requiring the defendant to go to trial in the absence of his regular counsel, T. S. Hurst.

In support of this ground, T. S. Hurst testified that he had known the defendant for several years and was employed by him as counsel in this case, about the 5th of May; that he talked with the county attorney about setting the case the following week, but did not agree upon a definite date; that on Sunday morning before May 8th, he was called to Oklahoma City on another case; that he thought he would be back on the Monday following; that prior to that time he had made no definite arrangements for witnesses; that part of his defense was going to be that the prosecuting witness is a disreputable Indian, and is not worthy of belief, which fact he could prove by a large number of the best citizens of Pawnee; that he was also going to introduce testimony to the effect that defendant was a man of good repute; that he knew defendant for several years at Okemah, and he was never suspected of being a bootlegger there, but was always a good citizen.

C. C. McCollum testified that he was the attorney who represented the defendant on May 8th, that he did not know defendant prior to that time and had not seen him until about 20 minutes to 10 that morning, when defendant came to his office and said that he had employed Mr. Hurst to look after his case, that Mr. Hurst had not returned and his case needed immediate attention, that he talked with the county attorney and advised that Mr. Hurst had made arrangements to go ahead with the case that morning, and the

jury were already in the courtroom, that he consented to go to trial as a matter of accommodation to Mr. Hurst.

It is strenuously urged that the evidence was insufficient to sustain the verdict, and that the verdict is the result of passion and prejudice, and that the punishment assessed by the jury is excessive.

Carefully considering all the evidence in the case, we do not believe that it is sufficient to warrant the verdict of the jury. The only fact admitted or established beyond any reasonable doubt was the possession of a half pint of whisky by the complaining witness. His testimony is certainly contradictory as to the other essential facts. He first states that he purchased and paid for the whisky on the street, that the defendant told him to wait there and he would return in a few minutes, and that it was not long until the defendant came back with a half pint. On cross-examination he states that the defendant was gone about an hour before he returned, and that he gave him the whisky in Katz's store. He also states that as he left the store the officers arrested him. These officers testify that they had been looking for him for about an hour and a half when he drove up in a car and they arrested him.

In view of the facts disclosed by the record, when the testimony of the witness Wichita is analyzed and given its proper force, it cannot be said that it is sufficient to satisfy any fair-minded man of the defendant's guilt beyond a reasonable doubt.

The judgment of the county court is therefore reversed, and a new trial granted.

MATSON, P. J., and BESSEY, J., concur.